IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 08-cv-02506-ZLW-BNB

EDWARD ALLEN,

Plaintiff,

v.

ARISTEDES ZAVARAS,
J. HASSENFRITZ,
MS. GRAHAM,
COLORADO DEPARTMENT OF CORRECTIONS, and
CORRECTIONS CORPORATION OF AMERICA,

Defendants.
_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

This matter arises on the plaintiff's **Motion for Restraining Order** [Doc. #46, filed 05/22/2009] (the "Motion"). I respectfully RECOMMEND that the Motion be DENIED.

The plaintiff seeks an order directing the Colorado Department of Corrections ("DOC") to move him "to a facility like Fremont" Correctional Facility where gang violence against sex offenders is not prevalent and to keep him at such a facility until resolution of this case.

The plaintiff is requesting a temporary restraining order pursuant to Fed. R. Civ. P. 65(b). However, where the opposing party has notice, as here, "the procedure and standards for issuance of a temporary restraining order mirror those for a preliminary injunction." Emmis Communications Corp. v. Media Strategies, Inc., 2001 WL 111229, *2 (D. Colo. Jan. 23, 2001).

Injunctive relief is a drastic remedy and is granted only in cases where the right to relief is clearly established. Goldammer v. Fay, 326 F.2d 268, 270 (10th Cir. 1964). The burden is on

the movant to establish his right to the relief requested.  Penn v. San Juan Hospital, Inc., 528

F.2d 1181, 1185 (10th Cir. 1975).  To obtain a preliminary injunction under Rule 65(a), the

plaintiff must show that (1) he will suffer irreparable injury unless the injunction issues; (2) the

threatened injury to the moving party outweighs whatever damage the proposed injunction may

cause the opposing party; (3) the injunction, if issued, would not be adverse to the public

interest; and

(4) there is a substantial likelihood that the moving party will eventually prevail on the merits.

Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir.1980).  The plaintiff's right to relief must be clear

and unequivocal.  Penn, 528 F.2d at 1185.

       The following kinds of preliminary injunctions are disfavored: (1) those that disturb the

status quo; (2) those that are mandatory as opposed to prohibitory; and (3) those that afford the

movant substantially all the relief he may recover at the conclusion of a full trial on the merits.

SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096 1098-99 (10th Cir. 1991).  "[A]ny preliminary

injunction fitting within one of the disfavored categories must be more closely scrutinized to

assure that the exigencies of the case support the granting of a remedy that is extraordinary even

in the normal course."  O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d

973, 975 (10th Cir. 2004).  The plaintiff seeks both a mandatory injunction and an injunction that

would disturb the status quo.[1] Therefore, he "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of the harms." Id. at 976.

In support of his Motion, the plaintiff submits an affidavit wherein he attests that he was housed at the Kit Carson Correctional Center ("KCCC") from April 29, 2008, until December 8, 2009; he was assaulted three times during his placement at KCCC; he is now housed at the Buena Vista Correctional Complex; and he has been threatened by gang members and is currently segregated from the general population for his own protection. *Motion*, Ex. A.

Subsequently, the plaintiff submitted seven separate affidavits wherein he detailed events occurring from May 2008 to the present:

1.  On May 6, 2008, while housed at KCCC, the plaintiff was placed in "E building, C pod" with inmate David Collins. Shortly thereafter, two inmates entered the plaintiff's cell and informed him and his cell mate that they would have to pay rent because they are sex offenders. The plaintiff refused to pay rent. The two inmates assaulted the plaintiff and Mr. Collins. The plaintiff reported the assault to defendant Hassenfritz. The plaintiff identified the assailants from pictures shown to him by Hassenfritz. Mr. Collins informed the plaintiff that he was told by two prison employees that they were in a "gang pod" and that they should not have been placed there because it is too dangerous. On May 13, 2008, the plaintiff and Mr. Collins were moved to "E building, A pod." The two assailants were moved somewhere else. *Affidavit* [Doc. #61], p. 1.

---

[1] Mandatory injunctions "affirmatively require the nonmovant to act in a particular way." SCFC, 936 F.2d at 1099. Injunctions that disturb the status quo alter the parties existing relationship. Id. at 1100. "The status quo is not defined by the parties' existing *legal rights*; it is defined by the *reality* of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." Id. (emphasis in original).

  2. On September 10, 2008, the plaintiff was working in the bakery section of the kitchen. Id. at pp. 1-2. Another inmate told the plaintiff to quit his job because he was not going to work with a sex offender. The plaintiff refused. The inmate assaulted the plaintiff. Defendant Graham reassigned the assailant to a different area in the kitchen. Id. at p. 2.

  3. On October 29, 2008, an inmate entered the plaintiff's cell and said his "[b]oss told him to do this." He then assaulted the plaintiff. As he exited the cell, the inmate told the plaintiff that his boss said to stay out of the pod because he is a sex offender. The plaintiff was seen and treated by medical personnel. Several nurses laughed at him and one nurse told him she did not want to know what happened. Id.

  4. Between October 30 and 31, 2008, the man known as the "boss" was moved out of the plaintiff's pod. On or about November 5, 2008, the plaintiff saw the boss in the hallway with the previous assailant. The boss congratulated the assailant. The assailant remained in the plaintiff's pod until November 30, 2008. Somebody told the plaintiff that the assailant had been arrested. Id.

  5. On December 1, 2008, the plaintiff was told to report to the Investigations Office. The investigator had the plaintiff fill out reports on the assaults and identify pictures of the boss and the assailant. Id.

  6. On December 3, 2008, the plaintiff left work for a dental appointment. A man named Neal appeared at work as well as the plaintiff's assailant from September 10, 2008, and the assailant's cell mate. The plaintiff went to the Investigations Office and told the investigator about the unusual "going on" at work. The plaintiff was moved to a segregation cell. Id.

7. On December 8, 2008, the plaintiff was moved from KCCC to the Colorado Territorial Correctional Facility ("CTCF"). On December 9, 2008, he was moved to the Buena Vista Complex. He was told by a case manager that his move was a lateral move because "CCA[2] couldn't handle you." He asked the case manager if she could protect him from gangs, and she stated "we can't protect you from gangs!" Id.

8. On March 5, 2009, the plaintiff was placed in a cell with a man named Edgar Robinson. Mr. Robinson gave him an orange. The next day Mr. Robinson said the plaintiff owed him a hamburger for the orange. The plaintiff said he did not bargain for the orange. Mr. Robinson said "well a blow job and I'll call it even." The plaintiff refused. Subsequently, Mr. Robinson "got[] into" the plaintiff's paperwork and told the plaintiff that if he did not give him a blow job he would "put the word out" that the plaintiff is a child molester. The plaintiff wrote a kite to his case manager. Id. The case manager moved the plaintiff to another cell in the same pod. Id. at p. 4.

9. On March 16, 2009, an inmate told the plaintiff that if he was to be put in any cell house, he was going to be beaten. The plaintiff notified his case manager. On April 1, 2009, he was moved to the east cell block. His new cell mate told him that the other inmates were saying bad things about him "something fierce" and he felt he was in danger just by being the plaintiff's cell mate. The plaintiff agreed to move to another cell.

10. Edgar Robinson was in the same pod. Mr. Robinson stated that he had been in segregation because he had sexual contact with his old cell mate. Id.

---

[2]CCA (Corrections Corporation of America) is a defendant in this case. CCA operates privately run prisons in Colorado, including KCCC.

11. On April 5 and April 8, 2009, two inmates threatened the plaintiff. The plaintiff sent a kite to his case manager. On April 10, 2009, he was called to see his case manager. He told his case manager about the inmates who threatened him. Less than an hour later, he was handcuffed and shackled and placed in segregation. Two days later, he was asked to testify at the hearing of one of the men who threatened him. He provided the testimony. About a week later, he was again asked to testify. "[A] man in plain closes [sic] not a uniform stoped [sic] the gaurd [sic] and sad [sic] no you cant [sic] testify weve [sic] never had anyone testify before." Id.

12. The plaintiff was moved to CTCF, cell house 5, on April 30, 2009. Id.

13. On May 4, 2009, the plaintiff was transferred from CTCF to Crowley County Correctional Facility ("Crowley"). As he was getting off the bus, the inmate that threatened him on May 1, 2009, pointed at him and told another inmate to "make sure to make him check in." *Affidavit*, [Doc. #64], p. 1. The plaintiff reported this to two CCA employees. One employee told the plaintiff he should be at Fremont if he was having this much trouble with gangs. The employee gave the plaintiff his cell assignment and told him that the inmate who threatened him was assigned to "the other yard" and that he was being placed with one of the inmates that was on the bus. Id. at pp. 1-2.

14. The plaintiff's cell mate asked the plaintiff for his "paperwork to show that [he] was not a sex offender." The plaintiff ignored him. On May 20, 2009, the plaintiff's cell mate told him that they were "going to have to fight or [the plaintiff was] to move to another cell because [he didn't] have paperwork." The plaintiff reported this to the movement sergeant. The sergeant told him that he had made six moves that week and was not making any more moves. Id. at p. 2.

6

The plaintiff went to his case manager about the problem. The case manager's porter pretended to be cleaning so that he could hear every word, so the plaintiff requested a grievance form. The plaintiff wrote that it was deliberate indifference to leave him in that cell. The case manager and a sergeant had the plaintiff fill out a statement. The sergeant then took the plaintiff to sign for his legal mail and to the medical department for intake questioning. The sergeant performed a pat search and purposely grabbed the plaintiff's penis and testicles. He stated "you don't like my pat serch [sic] then [I] will do a strip serch [sic]." The plaintiff believes that the sergeant was daring the plaintiff to sue him. Id.

15. Two guards took the plaintiff to segregation. They took his legal mail and told him he would have to submit a kite to get his legal materials. On May 21, 2009, his case manager approved his request to have his legal materials while in segregation. His "legal box" was brought to him, and he was told that he could "only have a few things" out of the box. He was allowed six legal pads and four folders from his box. He was not provided with envelopes or stamps. His request for a pen was denied. He was told that he would have to buy his own pen from the canteen. As of May 29, 2009, he still did not have his legal materials. Id.; *Affidavit* [Doc. #60].

16. On May 28, 2009, a man who called himself an investigator visited the plaintiff in segregation. The man asked the plaintiff why he was in segregation. The plaintiff told him it was because a gang member was demanding to see his paperwork. Later, a sergeant told the plaintiff that he was to return to the same yard but to a different cell house. The plaintiff stated that he could not go there. He wrote a statement that he was now a "snitch." His case manager came to his cell and informed him that he was going to be placed in administrative segregation

(as opposed to protective segregation) and that he was going to be written up for refusing a lawful order. He further informed the plaintiff that there were no documented security issues. *Affidavit* [Doc. #62].

17. On June 1, 2009, a CCA sergeant came to the plaintiff's cell door and told him that he was being released back into the general population. The plaintiff told her "I can't." About five minutes later, another employee came and repeated the same order. He again stated "I can't." *Affidavit* [Doc. #63]

18. On June 4, 2008, the plaintiff was given an administrative hearing. The sergeant was there as a witness. The charges were read to the plaintiff. The plaintiff pled not guilty. He stated that he felt the order to leave segregation was not lawful because it would put him in harm's way. He explained everything that had happened. The hearing officer told him he would give the information to his investigators and that the plaintiff might get this conviction overturned. He also stated that there are "a lot of inmates in seg refusing to leave." He suggested that the plaintiff "stop ratting the gang members." The plaintiff asked if he was supposed to fight them. The officer replied "I didn't say that." The plaintiff was placed back in his cell. Id.; *Affidavit* [Doc. #70], p. 1.

19. After the hearing, the plaintiff was told that Mr. Leonard Vehill wanted to talk to him on the phone. Mr. Vehill told the plaintiff that he has to "get with the [sex offender treatment] program" and become compliant. The plaintiff told him he was innocent. Mr. Vehill told the plaintiff that if he ran into a problem at the next facility, he would have the plaintiff sent to C.S.P. or to a facility in a state that was not near his family. *Affidavit* [Doc. #70], p. 1.

20. On June 15, 2009, the plaintiff was transferred to the Arkansas Valley Correctional Facility. On June 16, 2009, he was taken into Sergeant Roman's office. The plaintiff told the sergeant of his problems with gangs. The sergeant told the plaintiff that he would send him to the sex offender pod when a bed became available. He also said that "there are some gang members over there if they give you any truble [sic] kick there [sic] ass." Id.

21. On June 18, 2009, the plaintiff was moved to cell house 1, pod B, room 8. The inmate in the cell was heavily tattooed. He told the plaintiff he was the "shot caller" for cell house 1 and that they liked him because he keeps people in line. He said that most of the inmates there are sex offenders, so he needed to see the plaintiff's paperwork. The plaintiff told him that he did not have paperwork. The inmate told him "you're not moving into my house." The plaintiff told a female guard that he could not move into that cell because his cell mate is a gang member and he is a sex offender. She asked the plaintiff if he was compliant with the sex offender treatment program. The plaintiff told her that he could not confess his case because it is still in the courts. She said "then we can't put you in the [sex offender] pod." Id.

22. The plaintiff went back to his cell and told his cell mate that they were being set up because the cell mate is affiliated with gangs and the plaintiff refuses to "confess to [his] ex-wife's bullshit." The cell mate said he did not care and to get "your shit out of my house you are not staying here." The plaintiff moved his property to the day room and waited. Another inmate told him "you are not moving in with my friend so you might as well take your stuff back to cell house (6)." Id. A voice from the speaker system said "get [your] ass in the office." Id. at pp. 1-2. The plaintiff stepped into the office and the inmate he heard over the speaker said "this is

9

prison." He was told by a female guard that he would move in with the cell mate. The plaintiff said "then write me up and send me to C.S.P." Id. at p. 2.

23. The plaintiff went back to the pod. The door unlocked and he heard over the speaker the words "get your shit out of my day hall." The plaintiff gathered his property and set it down next to the exit of the cell house because the door was locked. A male guard came and handcuffed the plaintiff and took him back to the female guard's office. The female guard said "you are really starting to piss me off." He was moved to another room and told he had two choices: live in that cell or go to segregation. The plaintiff chose segregation. He was left in the room for about ten minutes. Then he was told that he was to be moved into the cell with the tattooed inmate. The plaintiff was led out of the room. He walked to the exit and stopped. Two officers tackled him and hurt him. His wrist was bent backwards while he was escorted to the medical department. He was taken to a back room in the medical department by Lieutenant Stinger. Lieutenant Stinger told him he could move the plaintiff to a strictly sex offender pod if he was compliant. The plaintiff stated that he could not confess his case because it is still in the courts. He was taken to segregation.

Based on the statements contained in these affidavits, particularly the statements pertaining to the plaintiff's incarceration at the Arkansas Valley Correctional Facility, I set an evidentiary hearing [Doc. #83]. On August 10, 2009, the plaintiff notified the court that he had been transferred from the Arkansas Valley Correctional Facility to the Sterling Correctional Facility ("Sterling") [Doc. #75].

At the hearing, the plaintiff provided testimony regarding his incarceration at Sterling:

1. The plaintiff arrived at Sterling on July 30, 2009. Several days after his arrival at Sterling, an inmate approached him. The inmate "knew" the plaintiff's "case."

2. The plaintiff's first cell mate did not care about the plaintiff's "affiliations." The cell mate was moved out of the plaintiff's cell approximately two weeks after the plaintiff's arrival.

3. Mr. Walker was placed in the plaintiff's cell. Mr. Walker wanted to know the plaintiff's "affiliations" and whether the plaintiff "had paperwork." The plaintiff told Mr. Walker that he "had none." Mr. Walker made at least three attempts to get moved out of the plaintiff's cell.

4. An individual named Mr. Miller and an individual with "star tattoos" approached the plaintiff after he got out of the shower. One of them threatened the plaintiff with injury if he did not "get rid of" Mr. Walker.

5. Two days later, Mr. Miller approached the plaintiff and told the plaintiff he had two days to "get rid of" his cell mate or he would be beaten. This happened in August or September of 2009.

6. The plaintiff reported these statements to the lieutenant. The plaintiff referred to Mr. Miller by name, and he described the individual with the tattoos. He told the lieutenant that he had to either beat his cell mate down or they were going to beat him down. He said "either I go back in there swinging or you move him." The lieutenant "finally moved him."

7. The individual with the star tattoos is now in the same pod as the plaintiff. The plaintiff has identified this individual to staff as a person who has threatened him. The plaintiff was told that he will be beaten if he goes to the yard or the gym, but he will be left alone if he stays out of the yard and gym. He also was told that "rules are rules."

### 1. Likelihood of Success on the Merits

On November 12, 2009, I recommended that all of the plaintiff's claims be dismissed except the claim against defendant Zavaras asserted in Claim Two. *Recommendation of United States Magistrate Judge* [Doc. #86]. Zavaras is the Executive Director of the DOC. *Complaint* [Doc. #3], p. 2, ¶ 2.

Claim Two alleges that Zavaras has knowledge of the long-standing, pervasive, well-documented, and escalating extortions, assaults, and murders committed throughout the DOC against sex offenders by gang members, predominantly white supremacists; Zavaras has been made aware of the problem through DOC criminal investigations, prisoner and victim incident statements, DOC and private prison employee-witnessed accounts, and inmate informants; the problem is fully documented in DOC files and records; Zavaras has deliberately created policies and practices of placing convicted sex offenders with gang members, even when there are documented custody issues between them, so that there is no reasonable measure of protection and safety for convicted sex offenders; the plaintiff was deliberately subjected to the defendants' policy; and Zavaras placed him at KCCC where he was repeatedly assaulted by white supremacist gang members. *Complaint*, pp. 9-10.

I construed Claim Two as alleging that Zavaras has an unwritten policy to place sex offenders with gang members; that he ordered the plaintiff to be placed with gang members at KCCC; and that the placement had the foreseeable consequence that the plaintiff would be subjected to coercion, extortion, and physical violence. I found that these allegations were sufficient to state a plausible claim against Zavaras for deliberate indifference to the plaintiff's

safety in violation of the Eighth Amendment.  *Recommendation of United States Magistrate Judge* [Doc. #86], pp. 9-10.

The Eighth Amendment places a burden on prison officials to "take reasonable measures to guarantee the safety of the inmates."  Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).  A prison official violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  A prisoner asserting a claim for failure to protect must establish that the deprivation alleged is sufficiently serious and that the defendant acted with deliberate indifference.  Id.  Deliberate indifference in this context means that the official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.

The plaintiff bears the burden of establishing that he has a *substantial* likelihood of succeeding on the merits.  The plaintiff has failed to meet that burden.  During the hearing, I specifically asked the plaintiff for the factual basis of his allegation that Zavaras authorized placement of sex offenders with known gang members so that they would be intimidated or injured.  The plaintiff replied that he had filed grievances about the issues, but admitted that the grievances were handled by Zavaras's subordinates.  He stated that Zavaras is in possession of all assault records of inmates, but was unable to provide a factual basis for this statement.  The plaintiff stated that he was told that if he became "sex offender compliant" he would be moved to a sex offender pod, but admitted that the statement was made by someone other than Zavaras.  He stated that Zavaras authorized all placements, but when asked for facts to support his

statement, he replied only Zavaras "appointed these people to watch over us" and Zavaras knows about inmate placements because of his supervisory role. The plaintiff admitted that he has never met with or spoken to Zavaras.

An individual cannot be held liable in a section 1983 action unless he caused or participated in an alleged constitutional violation. McKee v. Heggy, 703 F.2d 479, 483 (10th Cir. 1983). Respondeat superior is not within the purview of section 1983 liability. Id. In order for a supervisor to be liable under section 1983, there must exist a causal connection or an affirmative link "between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Butler v. City of Norman, 992 F.2d 1053, 1055 (10thCir. 1993); see also Rizzo v. Goode, 423 U.S. 362, 371 (1976). Without a showing of direct responsibility for the alleged violations, liability will not be imposed on a supervisory official. Id.

The plaintiff has not made any showing that Zavaras caused or participated in the prison officials' alleged failure to protect him. To the contrary, he admitted that he is seeking to hold Zavaras liable merely because Zavaras is the supervisor--the Executive Director--of the DOC. Therefore, the plaintiff has not shown a likelihood of success on his claim against Zavaras.

## 2. Irreparable Injury

A presumption of irreparable injury exists where constitutional rights are infringed. Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001). The plaintiff, however, has failed to establish a likelihood of success on his Eighth Amendment claim. As a result, he is not entitled to a presumption of irreparable injury.

"Determining whether irreparable harm exists can be a difficult and close question." Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1263 (10th Cir. 2004). "[T]he concept of irreparable harm does not readily lend itself to definition, nor is it an easy burden to fulfill.  In defining the contours of irreparable harm, case law indicates that the injury must be both certain and great, and that it must not be merely serious or substantial." Id. (internal quotations and citations omitted).  Injunctive relief is issued "to prevent existing or presently threatened injuries."  Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931).  Such relief "will not be granted against something merely feared as liable to occur at some indefinite time in the future." Id.

The plaintiff is no longer housed at the facilities which were the subjects of the Motion and his affidavits.  Therefore, his complaints regarding KCCC, Buena Vista, Crowley, and the Arkansas Valley Correctional Facility are moot.  Green v. Branson, 108 F.3d 1296, 1300 (10th Cir. 1997) (citing Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir.1985) (holding that a prisoner's claims for injunctive relief regarding prison conditions were moot where the prisoner had been moved to another prison unit); McKinnon v. Talladega County, 745 F.2d 1360, 1363 (11th Cir.1984) (holding that a prisoner's transfer to a different jail rendered his claim for injunctive relief moot even where prisoner argued that there was no assurance he would not be returned to first jail)).

The plaintiff is currently housed at Sterling.  He states that an individual named Mr. Miller and an individual with star tattoos threatened him with violence if he did not "get rid of" Mr. Walker as his cell mate.  The plaintiff reported the incident to his lieutenant and the

lieutenant moved Mr. Walker from the plaintiff's cell. Thus, there is no imminent danger to the plaintiff related to the incident with Mr. Walker.

The plaintiff also states that the individual with the star tattoos is now in the same pod as the plaintiff. The plaintiff states that he identified this individual "to staff" as a person who has threatened him, and he was told by an unidentified individual that if he goes to the yard or the gym he will be beaten; he will be left alone if he stays out of the yard and gym; and "rules are rules."

There is no evidence regarding whether the plaintiff has been in the yard or the gym since the comment was made; the identity of the individual who made the comment; or the date the comment was made. Nor is there any evidence that the plaintiff has been threatened by the individual with the star tattoos after resolution of the incident with Mr. Walker, or that he has been threatened by anyone else. The alleged statement is not sufficient to constitute a certain existing or presently threatened injury. Therefore, the plaintiff has not met his burden to demonstrate that he is currently threatened with immediate and irreparable injury.

Because the plaintiff has failed to establish that there is a substantial likelihood that he will prevail on the merits and that he will suffer irreparable injury unless the injunction issues, I need not address the remaining requirements for injunctive relief.

I respectfully RECOMMEND that the Motion be DENIED.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); Thomas

v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated January 26, 2010.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge